Slip Op. 14-58

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FISCHER S.A. COMERCIO, INDUSTRIA AND AGRICULTURA and CITROSUCO NORTH AMERICA, INC.,<br><br>                              Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>                              Defendant,<br><br>and<br><br>FLORIDA CITRUS MUTUAL and CITRUS WORLD, INC.,<br><br>                    Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 12-00340<br><br>**PUBLIC VERSION** |

## <u>OPINION</u>

[Final results of an administrative review of the antidumping duty order on certain orange juice from Brazil sustained.]

Dated: May 27, 2014

*Robert G. Kalik* and *Chelsea S. Severson*, Kalik Lewin, of Bethesda, MD, for plaintiffs.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Mykhaylo Gryzlov*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Matthew T. McGrath* and *Stephen W. Brophy*, Barnes, Richardson & Colburn, of Washington, DC, for defendant-intervenors.

Goldberg, Senior Judge: Plaintiffs Fischer S.A. Comercio, Industria and Agricultura and

Citrosuco North America, Inc. (collectively, "Fischer") contest the final results of the U.S.

Department of Commerce's ("Commerce" or the "Department") fifth administrative review of

the antidumping duty order on certain orange juice from Brazil. *See Certain Orange Juice from Brazil*, 77 Fed. Reg. 63,291 (Dep't Commerce Oct. 16, 2012) (final admin. review) ("*Final Results*"). In particular, Fischer disputes (1) Commerce's calculation of Fischer's financial expense ratio to include unrealized hedging results and to exclude long-term interest income and (2) Commerce's calculation of Fischer's international freight expenses to include a portion of a bunker fuel surcharge from a third-party shipping contract. For reasons discussed below, the court denies Fischer's motion and sustains the *Final Results*.

## BACKGROUND

In April 2011, the Department initiated its fifth and final administrative review of the antidumping duty order on certain orange juice from Brazil. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 23,545, 23,546 (Dep't Commerce Apr. 27, 2011). The review covered the period from March 1, 2010 to February 28, 2011. *Id.* Fischer, a Brazilian producer and exporter of orange juice concentrate, participated in the review and provided information regarding its business operations, home market sales, U.S. sales, cost of production, and constructed normal value. *See* Pls.' Mot. for J. on Agency R., ECF No. 26 ("Pls.' Br."), at 3–4. Most relevant here, Fischer submitted a financial expense ratio worksheet and information pertaining to a bunker fuel adjustment that Fischer's U.S. customers paid. *Id.*

Commerce preliminarily calculated a dumping margin of 8.73% for Fischer. *Certain Orange Juice from Brazil*, 77 Fed. Reg. 21,724, 21,733 (Dep't Commerce Apr. 11, 2012) (prelim. admin. review) ("*Prelim. Results*"). Because Commerce determined that all of Fischer's home market sales were below cost, Commerce based normal value on a constructed value. *Id.* at 21,730. Further, because Fischer sold subject merchandise exclusively to a U.S. affiliate

during the period of review, Commerce used a constructed export price when calculating

Fischer's dumping margin.  *Id.* at 21,727.

In administrative case briefing, Fischer contested certain portions of Commerce's

constructed value and constructed export price calculations.  *See generally* Fischer Case Br., PD

II 113–16 (May 11, 2012), ECF No. 19 (Dec. 5, 2012) ("*Fischer Admin. Case Br.*").  With

regard to constructed value, Fischer cited two alleged flaws in Commerce's computation of

Fischer's financial expense ratio.  First, Fischer averred that Commerce's decision to include

unrealized hedging losses in Fischer's financial expense ratio was both contrary to statute and

contrary to Commerce's prior practice.  *Id.* at 6–8.  Second, Fischer challenged Commerce's

refusal to offset the company's long-term interest expenses with long-term interest revenue.  *Id.*

at 8–9.  Both of these purported errors had the effect of inflating Fischer's net financial expenses

and the resulting financial expense ratio.

Fischer lastly objected to Commerce's method for calculating international freight

expenses, which are deducted from the constructed export price.  *Id.* at 2–5.  Because Fischer

shipped most subject merchandise through an affiliated shipper during the review period,

Commerce determined that those shipping rates did not reflect arms-length transactions.  *Prelim.*

*Results*, 77 Fed. Reg. at 21,728.  To restate Fischer's shipping expenses on an arms-length basis,

Commerce relied on invoices containing the rate that Fischer's affiliated shipper charged to an

unaffiliated party.  *Id.*  The invoice upon which Commerce based its calculations contained two

charges—an international freight rate and a separate bunker fuel surcharge.[1]  *See Fischer Admin.*

*Case Br.* 2–3.  In its case brief, Fischer challenged Commerce's inclusion of bunker fuel

---

[1] Shippers invoice a bunker fuel surcharge when the price of fuel rises above a baseline price stipulated by agreement.  *See* Pls.' Br. 20.  At least in Fischer's case, [[

                                                                                          ]].  *Id.*

surcharges, averring that Fischer always received reimbursement from its U.S. customers for the

bunker fuel surcharge. *See id.* at 3.

Commerce rejected Fischer's arguments and retained its preliminary findings in the *Final

Results*. Commerce's findings with regard to unrealized hedging results and long-term interest

revenue in particular represented a departure from previous review proceedings.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and must "hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i). When reviewing factual determinations for substantial evidence, the Court

considers the entire record, including any facts that "fairly detract[] from" the agency's

conclusion. *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir.

2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). A

decision is supported by substantial evidence if a reasonable mind might accept the evidence "as

adequate to support a conclusion," regardless of whether the Court would have reached the same

conclusion. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The Court applies the analysis outlined in *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), to assess whether Commerce's statutory

construction is in accordance with law. Under the *Chevron* rubric, the Court first assesses

"whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has,

then the Court must give effect to Congress's unambiguously expressed intent. *Id.* at 842–43.

However, if the statute is silent or ambiguous with respect to the pertinent issue, the Court defers

to an agency's reasonable construction of a statute it is entrusted to administer. *See id.* at 843.

Commerce's construction of antidumping laws in particular is entitled to "substantial deference." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995).

Finally, the Court's standard of review "precludes arbitrariness in the application of antidumping laws." *Thai Plastic Bags Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1298, 1302 (2013). Thus, when Commerce "act[s] differently . . . than it has consistently acted in similar circumstances without reasonable explanation," the Court must find Commerce's actions arbitrary. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

## DISCUSSION

### I.    Legal framework

A dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). Antidumping law requires that Commerce construct a normal value when, as here, all home market sales were made at less than the cost of production. *Id.* § 1677b(b)(1). Constructed value is calculated using a statutory formula that includes the cost of manufacturing, "the actual amounts incurred and realized" for selling, general, and administrative expenses ("SG&A"), and an amount for profits. *Id.* § 1677b(e). As part of its analysis, Commerce calculates a financial expense ratio where the "numerator . . . is the respondent's full-year net financial expenses" and the denominator is the "respondent's full-year cost of goods sold." *See Union Steel Mfg. Co. v. United States*, 36 CIT __, __, 837 F. Supp. 2d 1307, 1313–14 n.2 (2012).

19 U.S.C. § 1677b(f)(1)(A) instructs Commerce to normally calculate costs "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."

Commerce typically obtains the information needed to calculate a financial expense ratio from a company's audited financial statements for the period most closely corresponding to the period of review.  *See, e.g.*, *Fischer S.A. Comercio, Industria and Agricultura v. United States*, Slip Op. 12-59, 2012 WL 1942109, at *4 (CIT Apr. 30, 2012).

Antidumping law also requires that Commerce use a constructed export price when a producer or exporter sells to an affiliated U.S. buyer.  *See* 19 U.S.C. § 1677a(b).  From that price, Commerce deducts "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses . . . incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  *Id.* § 1677a(c)(2)(A).  When a producer or exporter ships through an affiliated company, Commerce often calculates freight expenses using information derived from unaffiliated party transactions. *See* Issues & Decision Mem., A-351-840 (Oct. 9, 2012) ("*I&D Mem.*"), at 38.

## II.     Commerce's calculation of Fischer's financial expense ratio was supported by substantial evidence, was not arbitrary, and accorded with law

Fischer contends that Commerce erred when computing Fischer's financial expense ratio for the fifth period of review.  Specifically, Fischer claims that Commerce (1) arbitrarily treated long-term interest expenses differently from long-term interest income and (2) acted contrary to unambiguous statutory language by including unrealized hedging losses in Fischer's net financial expenses.  Fischer further avers that Commerce's treatment of both long-term interest income and unrealized hedging losses constituted an arbitrary departure from prior reviews.  The court proceeds first by considering Fischer's arguments related to long-term interest income, then turns to the issue of unrealized hedging losses.  As set forth below, the court sustains on both issues.

### A.  Long-term interest income

    i.  Fischer did not exhaust its administrative remedies regarding the claim that Fischer had a reliance interest in Commerce's acceptance of a long-term interest income offset

Fischer argues as a threshold matter that Commerce arbitrarily departed from past practice by excluding long-term interest income from Fischer's financial expense ratio.  Pls.' Br. 8–11.  Fischer claims that it detrimentally relied on Commerce's calculations in prior administrative reviews to structure its business operations in the current administrative review. *Id.* at 9.  As a result, Fischer believes that "[p]rinciples of fairness prevent Commerce from changing its methodology at this late stage."  *Id.* (quoting *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417, 421 (1992)).

However, the Government correctly notes that Fischer failed to exhaust its administrative remedies with regard to this claim.  *See* Def.'s Opp'n to Pls.' Mot. for J. on Agency R., ECF No. 39 ("Def.'s Br."), at 26–30; *see also* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").  Commerce's regulations require that parties state all relevant arguments in their case briefs, "including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c)(2) (2013).  Yet Fischer did not raise the issue of Commerce's apparent deviation from practice in its case brief and instead only obliquely discussed the issue in a supplemental questionnaire response.

In that questionnaire response, Fischer noted that "[t]he Department has accepted and verified the inclusion of interest income in its entirety . . . in all previous reviews of this case." Fischer Second Suppl. Section D Questionnaire Resp. 4, CD IV 121 (Feb. 8, 2012), ECF No. 19 (Dec. 5, 2012).  But Fischer offered that statement before Commerce even announced that it

would not deduct long-term interest income.  *See* Prelim. Calculations Mem. 2, PD IV 160 (Mar.

30, 2012), ECF No. 19 (Dec. 5, 2012) ("*Prelim. Calculations Mem.*") (announcing decision).  As

such, Fischer never claimed (and could not have claimed at that point) that Commerce departed

from practice.  Furthermore, Fischer abandoned any argument related to that issue by not later

renewing it in its case brief.  *See* 19 C.F.R. § 351.309(c)(2).

Fischer attempts to preserve the argument before this court by asserting that it raised the

"general" issue at the administrative level, but that is inaccurate.  *See* Pls.' Reply in Supp. of

Mot. for J. on Agency R., ECF No. 45 ("Pls.' Reply"), at 13.   Though Fischer expressed

disagreement with the legality of disallowing a long-term interest income offset in its case brief,

that argument does not encompass the separate issue of whether Commerce unreasonably

departed from prior practice.  Thus, based on the foregoing, the court declines to consider

Fischer's belated argument.[2]

ii.   Commerce's treatment of Fischer's long-term interest expenses and
       long-term interest income was neither arbitrary nor capricious

Fischer additionally challenges Commerce's refusal to offset long-term interest income

against long-term interest expenses as arbitrary and capricious.  Pls.' Br. 11.  An agency decision

is arbitrary and capricious "if the agency . . . relied on factors which Congress has not intended it

to consider, entirely failed to consider an important aspect of the problem, . . . or is so

implausible that it could not be ascribed to . . . the product of agency expertise."  *Motor Vehicle*

---

[2] In any event, Fischer could not seriously argue that it had a reliance interest in Commerce's practice of offsetting long-term interest expenses with long-term interest income.  Outside of the context of this order, Commerce has a well-established practice of excluding long-term interest income from financial expense ratios, and the court has upheld Commerce's practice as reasonable.  *See, e.g.*, *Pakfood Pub. Co. v. United States*, 34 CIT __, __, 724 F. Supp. 2d 1327, 1356–57 (2010) (noting that Commerce has "established a practice of allowing income expense offsets solely for short-term income from current assets and working capital accounts" and upholding the reasonableness of that practice).  Indeed, Fischer received Commerce's standard questionnaire in this review, which instructed Fischer to calculate net interest expenses for COP and CV by "includ[ing] interest expense relating to *both long- and short-term borrowings*" and reducing that amount "by any *interest income* earned by your company on *short-term investments* of its working capital."  Fischer Section D Questionnaire Resp. 28, CD III 13 (June 29, 2011), ECF No. 19 (Dec. 5, 2012) (emphasis added).

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Commerce's exclusion of long-term interest income from Fischer's financial expense ratio was not arbitrary.

Statute requires that Commerce include certain expenses incurred "in connection with the production and sale of a foreign like product" in its calculation of constructed value.[3]   19 U.S.C. § 1677b(e)(2)(A).  Financial expenses—the costs companies incur to borrow money—occur "in connection with the production and sale of a foreign like product" if the company uses borrowed capital to finance production.  *See Cinsa, S.A. de C.V. v. United States*, 21 CIT 341, 351, 966 F. Supp. 1230, 1239 (1997) (noting same regarding cost of production).

When calculating financial expenses, Commerce included interest paid on Fischer's short- and long-term loans on the basis that those loans helped finance production during the period in question.  *See I&D Mem.* 46.  Commerce then offset short- and long-term interest expenses against interest that Fischer earned on short-term assets.  *Id.*  Commerce authorized this offset because liquid assets in short-term, interest-bearing accounts are presumably available to finance daily operations.  *Id.*  By contrast, Commerce declined to deduct interest earned on long-term interest bearing assets because money deposited in long-term accounts is insufficiently liquid for use in current operations.  *I&D Mem.* 45–46.  The court finds that Commerce's methodology was not arbitrary and was a reasonable exercise of "statutory gap-filling on an issue where the anti-dumping statute is silent."  *See Pakfood Pub. Co. v. United States*, 453 F. App'x 986, 989 (Fed. Cir. 2011); *see also Apex Exps. v. United States*, Slip Op. 13-158, 2013 WL

---

[3] In the I&D Memo, Commerce supported its methodology by reference to 19 U.S.C. § 1677b(b)(3)(B), which governs the calculation of cost of production.  *See I&D Mem.* 45.  It appears that Fischer technically challenges Commerce's constructed value, the calculation of which is governed by § 1677b(e)(2)(A).  *See* Pls.' Br. 11.  Regardless, Commerce calculates SG&A costs for purposes of cost of production and constructed value in largely the same way.  *See Thai Plastic Bags Indus. Co. v. United States*, 36 CIT __, __, 853 F. Supp. 2d 1267, 1270 (2012); *see also* 19 U.S.C. § 1677b(b)(3) (including SG&A expenses "based on actual data pertaining to production and sales of the foreign like product"); *id.* § 1677b(e)(2)(A) (including "the actual amounts incurred and realized" for SG&A expenses and for profits "in connection with the production and sale of a foreign like product").

6978901, at *5–6 (CIT Dec. 31, 2013) (identifying Commerce's practice and upholding it as

reasonable); *Pakfood Pub. Co.*, 34 CIT at __, 724 F. Supp. 2d at 1357 (same).

Fischer claims that Commerce's practice "arbitrarily ignores the benefits a company

receives from long-term interest income." Pls.' Br. 13. However, Fischer's argument ignores

that 19 U.S.C. § 1677b(e)(2)(A) limits the universe of expenses to be included in constructed

value. While long-term interest income undoubtedly benefits a company's bottom line,

Commerce need not deduct that income if the interest-generating investment is unrelated to

production during the review period. *See id.*

Fischer further asserts that Commerce's practice arbitrarily treats long-term interest

income differently from long-term interest expenses. Pls.' Br. 12. According to Fischer,

Commerce's treatment of long-term interest expenses is premised on the conclusory assumption

that the underlying long-term liability provided operating cash during the period of review. *Id.*

Fischer avers that Commerce had no basis for making that assumption because Commerce only

had information pertaining to the long- or short-term nature of the liabilities and not when the

long-term liabilities actually provided a cash influx for use in operations. *Id.* As a result, Fischer

submits that Commerce should have either not included long-term interest expenses in its

calculations at all or should have offset those expenses by long-term interest income. *Id.*

But because Fischer did not present this argument with any degree of specificity below,

the court will not consider it for the first time here. In its case brief, Fischer requested that

Commerce exclude or offset its long-term interest expenses "to accurately reflect Fischer's

interest income and expenses during the [period of review]." *Fischer Admin. Case Br.* 8. This

language failed to notify Commerce that some of Fischer's interest expenses might have

stemmed from loans that only provided cash infusions prior to the review and were unrelated to

current production. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990) (noting that respondents must raise both general issues and specific arguments in case

brief to preserve arguments for appeal); *Trust Chem Co. v. United States*, 35 CIT __, __, 791 F.

Supp. 2d 1257, 1268 n.27 (2011) (finding that remedies exhausted if case brief put Commerce on

notice of issue). The court thus declines to pass on Fischer's late-raised argument.

### B. Unrealized hedging losses

  i. <u>Principles of fairness did not prevent Commerce from changing its treatment of unrealized hedging losses in this review</u>

Fischer next challenges Commerce's inclusion of purportedly unrealized hedging results

in Fischer's financial expense ratio. Pls.' Br. 13. Again, Fischer attacks Commerce's

determination as an arbitrary departure from past practice in the third and fourth administrative

reviews.[4] *See id.* at 16. Fischer cites the court's decision in *Shikoku* as support for the

proposition that Fischer had a reliance interest in the exclusion of unrealized hedging losses that

precluded adoption of a new methodology in the fifth review. *See id.* at 9 (citing *Shikoku*, 16

CIT at 388, 795 F. Supp. at 421).

In *Shikoku*, Commerce permitted plaintiffs to adjust home market prices for costs

associated with repacking subject merchandise into a form suitable for sale. 16 CIT at 384, 794

F. Supp. at 418. Commerce used a particular method for calculating these costs in the

investigation and the first four administrative reviews, but abruptly changed course in the fifth

administrative review. *Id.* This new method resulted in a non-*de minimis* margin for the first

---

[4] The parties dispute how long Commerce has excluded unrealized hedging losses from its financial expense calculations. Fischer argues that the exclusion of unrealized hedging losses spanned all prior reviews and the investigation, but Commerce contends that the exclusion occurred in only the third and fourth reviews. *Compare* Pls.' Br. 14, *and* Pls.' Reply 3 n.1, *with* Def.'s Br. 16. Because the conclusive evidence Fischer submitted is confined to the third and fourth reviews, the court does not credit Fischer's argument that Commerce followed a similar practice in all prior reviews.

time in three years, leading Commerce not to revoke the antidumping duty order that otherwise

likely would have been revoked.  *See id.* at 383–84, 795 F. Supp. at 418.

Plaintiffs contested Commerce's belated change in practice on the basis that they

detrimentally relied on the old method of calculating repacking costs.  *Id.* at 386, 795 F. Supp. at

420.  No one disputed plaintiffs' reliance on the prior methodology, but the government claimed

that it was free to change its calculations in the interest of enhanced accuracy.  *Id.* at 386–87, 795

F. Supp. at 420.  The court disagreed, finding that "[p]rinciples of fairness prevent[ed]

Commerce from changing its methodology at this late stage."  *Id.* at 388, 795 F. Supp. at 421.

The *Shikoku* court did not announce an unyielding rule that Commerce may not change

course throughout the life of an antidumping order.  Rather, the court found that adherence to

prior methodology was required based on the unique facts of that case.  Specifically, the court

found in plaintiffs' favor because (1) Commerce's new methodology was only marginally more

accurate than the previous methodology, if at all; (2) Commerce had accepted the old

methodology in the investigation and four administrative reviews; (3) undisputed record

evidence revealed that plaintiffs adjusted their prices in reliance on the prior methodology; and

(4) the last-minute improvement precluded revocation of the antidumping duty order and resulted

in another three years of administrative reviews.  *See generally id.* at 387, 795 F. Supp. at 421.

The facts in this case are distinguishable from those in *Shikoku*, and a different result is

warranted.  Initially, it does not appear that Commerce had an established policy of excluding

unrealized hedging losses from companies' financial expense ratios.  Commerce submits that its

actual practice is to *include* such losses and that Commerce's contrary actions in the third and

fourth reviews were aberrant.  Def.'s Br. 18 (citing *Micron Tech., Inc. v. United States*, 19 CIT

829, 839–40, 893 F. Supp. 21, 33 (1995)).  Regardless, "two prior determinations are not enough

to constitute an agency practice that is binding on Commerce." *Shandong Huarong Mach. Co. v. United States*, 30 CIT 1269, 1293 n.23, 435 F. Supp. 2d 1261, 1282 n.23 (2006); *see also NTN Bearing Corp. v. United States*, 19 CIT 1221, 1234–35, 905 F. Supp. 1083, 1095 (1995) (sustaining Commerce's change in practice because the record contained no evidence of detrimental reliance and it was only the third administrative review).  This seems particularly true in this case, where Commerce's "practice" was accepting calculations that Fischer itself offered in its financial expense worksheet and that no one challenged.

Even assuming that Commerce had established a practice of excluding unrealized hedging losses, Fischer has not provided any evidence of detrimental reliance.  *See, e.g.*, *Sanyo Elec. Co. v. United States*, 23 CIT 355, 366, 86 F. Supp. 2d 1232, 1243 (1999) (finding record evidence of actual reliance necessary to warrant remand under *Shikoku*'s reasoning).  Although Fischer claims that it conducted regular internal reviews of its pricing practices and "proactively ran simulations of Commerce's dumping margin calculations using Commerce's own methodologies and computer programs from past reviews to guide its pricing," Fischer never made that claim below.  *See* Pls.' Br. 9.  Moreover, Fischer offers no evidence in support of its reliance argument other than its bare assertion that it relied on Commerce's past methodologies.

This case is also different from *Shikoku* because Commerce explained here why its "new" methodology was more than a minor improvement over prior methodology.  *See I&D Mem.* 41–44.  Specifically, Commerce asserted that including all incurred hedging losses in Fischer's financial expense ratio accurately depicted "how the entity as a whole manages its overall foreign currency exposure and risk associated with interest rate variations."  *Id.* at 42.  By contrast, "[i]ncluding only certain components that result from the company's coordinated efforts

to manage its foreign currency exposure" (i.e., including realized hedging results and not

unrealized hedging results) distorted net financial expenses.  *Id.*

In sum, the principles articulated in *Shikoku* did not preclude Commerce's shift regarding

unrealized hedging losses.  Commerce explained why it preferred the methodology that it used in

this review, included citations to other proceedings where Commerce included unrealized results

in the financial expense ratio, and admitted that its prior exclusion of unrealized hedging results

stemmed from "oversight" and not a conscious methodological choice.  *See* Def.'s Br. 19.  On

these facts, the court does not find that Commerce acted arbitrarily.

> ii.   <u>Commerce did not contravene statute by including among Fischer's</u>
>       <u>financial expenses unrealized hedging losses reported in Fischer's</u>
>       <u>financial statements</u>

Fischer contends alternatively that Commerce contravened law and record evidence by

including unrealized hedging results in the company's financial expense ratio.  Fischer claims

that the uncontroverted record in this case reflected that Fischer sustained unrealized hedging

losses during the 2010 fiscal year.  Pls.' Br. 17–18.  Fischer asserts that Commerce acted

unlawfully by including those *unrealized* losses in its calculation of constructed value even

though the statute's unambiguous language refers only to *incurred and realized* losses.  *See id.* at

14–15 (quoting 19 U.S.C. § 1677b(e)(2)(A)).

Some background is helpful to frame Fischer's argument.  Companies "hedge," among

other reasons, to protect against interest rate risk or currency exchange rate risk.  *See* Black's

Law Dictionary 791 (9th ed. 2009).  Companies may use what are known as "swaps" to structure

a portion of their hedging operations.  A currency swap is "[a]n agreement to swap specified

payment obligations denominated in one currency for specified payment obligations

denominated in a different currency."  *Id.* at 1585.  An interest-rate swap results when a

company transacts with another party "to exchange interest receipts or interest-payment

obligations," possibly with the intent of converting obligations "from a fixed to a floating rate—

or from a floating to a fixed rate." *Id.* at 888.  [[

                                                        ]].  *See* Fischer Third Suppl. Sections C &

D Questionnaire Resp. 2, CD IV 126 (Mar. 1, 2012), ECF No. 19 (Dec. 5, 2012) ("CD IV 126").

Companies document hedging gains and losses in their financial statements.  Here,

Fischer reported a total hedging loss of R$[[             ]] in the operating loss section of its 2010

audited income statement.  Fischer Section A Questionnaire Resp. at Ex. 13 at 2, CD III 7 (June

6, 2011), ECF No. 19 (Dec. 5, 2012) ("*2010 Financial Statements*").  An income statement

reflects all "revenues, expenses, gains, and losses that a business incurred during a given period."

Black's Law Dictionary, *supra*, at 833.

Although Fischer recognized and "incurred" the full hedging loss in its 2010 income

statement, Fischer explained in a note accompanying that statement that certain recognized

losses were unrealized.  *2010 Financial Statements* 39, 42.  In other words, R$[[             ]] of

the total reported losses concerned decreases in the market value of hedging instruments that had

not yet reached maturity or been sold.  *Id.* at 39.  Fischer clarified in a questionnaire response

that the unrealized losses amounted to the difference between the 2010 mark-to-market value and

the 2009 mark-to-market value of [[       ]] hedges.  CD IV 126 at 2.  Mark-to-market values

refer to a method of accounting for the market value of assets on a certain date (here, the closing

date of Fischer's 2010 financial statements).  *See* Black's Law Dictionary, *supra*, at 23.

Fischer structured its income statement this way to comply with Brazilian GAAP, which

required that Fischer use the accrual method of financial accounting.  *See 2010 Financial*

*Statements* 3 (noting that the financial statements complied with Brazilian accounting standards);

*I&D Mem.* 43.  Accrual accounting recognizes debits and credits as they arise, rather than when the expenses are actually paid out or when cash is actually received.  *See* Black's Law Dictionary, *supra*, at 22.  Thus, while certain reported losses may remain unrealized under accrual accounting, those losses are nonetheless treated as actual losses in the company's books and records and have an immediate impact on the company's financial position.  *I&D Mem.* 43.

Against this backdrop, Fischer believes that Commerce contravened the unambiguous language of 19 U.S.C. § 1677b(e)(2)(A) by including in constructed value financial expenses that were not "realized" during the period of review.  *See* Pls.' Br. 14.  However, Fischer's interpretation must fail because it creates tension with other parts of the statute and with the purpose of constructed value.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (noting that ambiguity "may only become evident when placed in context" and that a statute must be interpreted "as a symmetrical and coherent regulatory scheme"); Statement of Administrative Action, H.R. Rep. No. 103–316, at 835 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172 (noting that costs must be allocated "using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under . . . review").

While § 1677b(e) instructs Commerce to include "actual amounts incurred and realized" in producing the foreign like product, § 1677b(f)(1) outlines the method by which Commerce should calculate those costs.  Specifically, § 1677b(f)(1)(A) instructs Commerce to normally calculate costs based on company records, provided such records are kept in accordance with the home country GAAP and "reasonably reflect the costs associated with the production and sale of the merchandise."  It is undisputed here that Fischer's income statement complied with Brazilian GAAP and that Brazilian GAAP required that Fischer use the accrual accounting method.  Thus,

the court would have to find that the reported, unrealized hedging losses did not reasonably

reflect costs during the review to disregard those costs.  *See id.*  But Fischer has not persuaded

the court that including such losses distorts costs.

In fact, it seems that *excluding* the losses might actually be distortive.  As Commerce

explained below, accrual basis companies like Fischer report the results of their risk management

efforts at specified intervals.  *See I&D Mem.* 43.  Some results may not be realized in that they

may ultimately materialize into a larger loss or even a gain.  But the company nonetheless treats

the reported costs as actual expenses during the reporting period, and those expenses financially

impact the company as lost purchasing power.  *See id.*  Indeed, when previously unrealized

instruments reach maturity, companies evidently only report the difference between the final

realized amount and the previous year's mark-to-market value on their income statement.  *Id.* at

43 n.95; *see also* CD IV 126 at 2 (reporting that Fischer's calculation of unrealized hedging

losses represents the difference between the 2010 and 2009 mark-to-market values of certain

hedging instruments).  Therefore, counting previously unrealized losses only in the period in

which they are realized would distort expenses, as gains or losses reported in previous fiscal

years would not be reflected in the final realized amount.[5]  *I&D Mem.* 43–44 n.95.

_____

[5] Commerce provided the following example of this distortion in its Issues & Decision Memorandum:

> If Fischer acquired an asset for Rs. 100, it would record the value of this asset as Rs. 100 in its
> books and records. However, if the market value on the mark-to-market date declined to Rs. 90,
> Fischer would reduce its book value of the asset to Rs. 90 and recognize the Rs. 10 loss as an
> unrealized loss on its income statement. If Fischer then sold the asset during the next fiscal year
> (FY) for Rs. 70, it would recognize an additional Rs. 20 as a realized loss on its income statement.
> Because the total loss was Rs. 30, the Department includes the first Rs. 10 as a loss in FY1 and the
> second Rs. 20 as a loss in FY2 (for a total loss of Rs. 30). Under Fischer's proposal, the
> Department would only include the second loss, clearly understating its costs.

*I&D Mem.* 43–44 n.95.  Fischer does not dispute the accuracy of Commerce's example in its briefing.  Although
Fischer believes that the plain meaning of 19 U.S.C. § 1677b(e) precludes the inclusion of unrealized losses, Fischer
neither denies that *excluding* unrealized hedging losses skews overall expenses nor argues that *including* unrealized
hedging losses is somehow distortional.  *See id.* at 43 (noting that Fischer has not identified any specific distortions).

For these reasons, Commerce found that "[i]ncluding only certain components that result from the company's coordinated efforts to manage its foreign currency exposure does not reflect the financial results of the enterprise's foreign exchange management efforts adequately." *Id.* at 42. Fischer does not directly challenge Commerce's findings in this regard, and the court must accord those findings substantial deference. *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (noting that "Commerce is entitled to substantial deference in its choice of accounting methodology"); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (requiring "tremendous deference" to Commerce's resolution of technical accounting issues, as "agencies possess far greater expertise than courts" in such areas).

Commerce's conclusion was also consistent with relevant case law. In *Micron Technology, Inc. v. United States*, respondents challenged Commerce's decision to include certain foreign exchange translation gains and losses in G&A expense calculations. 19 CIT at 839, 893 F. Supp. at 33. These gains and losses were "unrealized adjustments based upon the conversion of outstanding foreign currency monetary assets and liabilities into domestic currency . . . for purposes of inclusion on a company's balance sheet." *Id.* Respondents claimed that the losses were only hypothetical, but this court disagreed. *Id.* at 840, 893 F. Supp. at 33. The court found that while there was "no actual outflow of funds from the company, the resulting exposure to increased liability for borrowed funds caused by fluctuations in the exchange rate [was] by no means hypothetical." *Id.* Rather, the losses were "akin to an increased cost of borrowing funds that should be included in any reasonable measure of the cost climate faced by the company during" the relevant period. *Id.* Like in *Micron*, the unrealized losses at issue here are similarly reflective of Fischer's cost climate during the period of review.[6]

---

[6] Fischer suggests that *Micron* is distinguishable because that case involved increased exposure to liability resulting from fluctuating exchange rates on borrowed foreign currency (a liability) and this case involves derivative

Fischer asserts that *Micron* is inapposite and that this court's decision in *Fischer* mandates the exclusion of unrealized hedging losses. *See* Pls.' Br. 15–16. But the court does not interpret *Fischer* that way. In that case, Fischer's financial statements included a presentation of how certain accounts valued in U.S. dollars would change if they were presented in terms of Brazilian reais. *See Fischer*, 2012 WL 1942109, at *3. This court held that those purely hypothetical currency translation losses were not realized within the meaning of 19 U.S.C. § 1677b(e)(2)(A). *See id*. However, the holding in *Fischer* was premised on the fact that Fischer only included the hypothetical translation losses to comply with Brazilian law, and the expenses were never actually incurred and did not result from intentional cash management decisions. *Id*. The losses at issue here clearly reflect the actual, recognized results of Fischer's intentional strategy to manage interest and exchange rate risks. Thus, reliance on *Fischer* is misplaced.

In sum, Fischer's interpretation would require this court to create a conflict with other portions of the statute and would distort the actual cost climate that Fischer faced during the period of review. For these reasons, the court declines to find that 19 U.S.C. § 1677b(e)(2)(A) required Commerce to include only certain portions of Fischer's reported financial losses.

**III.    Commerce's method of calculating the international freight expenses deducted from Fischer's constructed export price was supported by substantial evidence and accorded with law**

The final issue in this case concerns the allegedly erroneous calculation of international freight expenses deducted from Fischer's constructed export price. *See* 19 U.S.C. § 1677a(c)(2)(A) (providing for the deduction of international freight costs). When calculating

---

contracts (assets). Pls.' Reply 11. However, Fischer does not explain why this distinction makes a difference in the context of this case. Indeed, the value of both assets and liabilities can fluctuate over time. It is the reported fluctuations that are relevant here, and seemingly not the characterization of the underlying instrument. It appears that an unrealized increase in liability, or an unrealized diminution in the value of an asset, "should be included in any reasonable measure of the cost climate faced by the company during" the period under review. *Micron*, 19 CIT at 840, 893 F. Supp. at 33.

Fischer's freight expenses in this review, Commerce disregarded the shipping costs that Fischer

paid to affiliated shippers in favor of the rate that an affiliated shipper charged to an unaffiliated

customer.  *I&D Mem.* 38.  Included within the unaffiliated shipping rate were international

freight costs and a bunker fuel surcharge.[7]  *Fischer Admin. Case Br.* 2–3.  Fischer asked

Commerce to offset the bunker fuel surcharge for all U.S. sales because Fischer always passed

that charge on to the U.S. customer as a bunker fuel adjustment.  *Id.* at 3.  Commerce in turn

offset the surcharge by the amount of the actual reimbursements that Fischer reported receiving

from its U.S. customers during the period of review.  *See I&D Mem.* 38.

Fischer claims that Commerce's actions amounted only to a partial offset of the bunker

fuel surcharge and that Commerce, therefore, unlawfully overstated Fischer's freight expenses

and artificially reduced Fischer's export prices.[8]  *See* Pls.' Br. 23.  In particular, Fischer claims

that reducing overall freight expenses by the bunker fuel adjustments that Fischer reported

receiving did not fully offset the total amount of the bunker fuel surcharges.  *Id.*  According to

Fischer, Commerce should have wholly offset the bunker fuel surcharge for every U.S. sale.  *Id.*

The court finds Fischer's arguments unpersuasive because Fischer's assertions before this

court contradict the offset method proposed below.  In its case brief, Fischer argued that where

bunker fuel surcharges are incurred, "the Department must include an offset if Fischer's

customer reimbursed Fischer for the surcharge."  *Fischer Admin. Case Br.* 5.  Fischer then

elaborated that "[t]he bunker fuel surcharge reimbursed by Fischer's customer *is the same*

---

[7]  Commerce used an invoice from one of Fischer's affiliated shippers to an unaffiliated customer to calculate a bunker fuel surcharge of $[[     ]] per metric ton and an international freight rate of $[[   ]] per metric ton for total freight expenses of $[[     ]] per metric ton.  *See* Fischer Section C Questionnaire Resp. at Ex. 10, CD III 10 (June 22, 2011), ECF No. 19 (Dec. 5, 2012) ("*Fischer Section C QR*"); *Prelim. Calculations Mem.* 1.

[8]  Notably, Fischer does not challenge Commerce's decision to disregard the invoices reflecting what Fischer actually paid its affiliated shipper for shipping services.  Fischer also does not contest the arms-length freight rate that Commerce selected for deduction from Fischer's constructed export price.  Lastly, Fischer does not dispute Commerce's attribution of a bunker fuel surcharge to every sale (except that Fischer believes the bunker fuel adjustment should have completely offset the surcharge).

*amount* charged by Fischer's affiliated shipper to unaffiliated parties.  Thus, whether the

Department offsets Fischer's international freight expense by the bunker fuel surcharge[]

invoiced by [affiliated shipper] to [unaffiliated customer], *or the adjustment invoiced by Fischer*

*to its U.S. customer*, the result is *the same . . . .*"  *Id.* at 5 n.1 (emphasis added) (citation omitted).

Commerce did what Fischer requested by offsetting Fischer's expenses by the adjustments that

Fischer reported receiving in its Section C database.  Fischer may not now advocate a different

approach.  *See* Def.'s Br. 34 (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Trs. in*

*Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010)).

      In any event, Fischer has not demonstrated that Commerce's offset method distorted

freight expenses.  Fischer asserts that Commerce offset an arms-length bunker fuel surcharge of

$[[    ]] per metric ton by a $[[    ]] per metric ton bunker fuel adjustment paid by Fischer's

U.S. customer, leaving a net bunker fuel surcharge included among freight expenses.  Pls.' Br.

23.  However, Fischer cites only one invoice and a corresponding adjustment in support of this

proposition.  *See id.* at 21; Fischer Suppl. Section C Questionnaire Resp. at Ex. 5, CD IV 61–81

(Oct. 27, 2011), ECF No. 19 (Dec. 15, 2012).  While the bunker fuel surcharge (and adjustment)

reflected in those documents was $[[    ]], Fischer does not argue that *every* bunker fuel

adjustment was that same amount.  Indeed, the bunker fuel surcharge was tied to prevailing fuel

rates at shipment and presumably varied during the period in question (perhaps even exceeding

$[[    ]] per metric ton).  *See Fischer Section C QR* 9–10 (noting that field "BILLADJ1"

contains bunker fuel adjustments) and U.S. Sales Database (reporting varied amounts under

"BILLADJ1").  Fischer has thus not conclusively established a distortion.

      Moreover, Fischer has not proposed a workable alternative to any possible distortion

caused by Commerce's methodology.  It appears that Fischer advocates disregarding the bunker

fuel surcharge entirely for purposes of deducting international freight expenses. However, that

argument ignores the court's holding in *Fischer S.A. Comercio, Industria and Agricultura v.*

*United States*, 36 CIT __, __, 885 F. Supp. 2d 1366, 1372 (2012), that the bunker fuel surcharge

and the bunker fuel adjustment are two separate events. Entirely disregarding the bunker fuel

surcharge here would be inappropriate because Fischer did not report a bunker fuel adjustment

for every U.S. sale. *See* Def.-Intervenors' Resp. Br., ECF No. 36, at 15; Fischer Second Suppl.

Sections B & C Questionnaire Resp. at Ex. 2, CD IV 102–08 (Jan. 25, 2012), ECF No. 19 (Dec.

5, 2012). Therefore, Fischer's proffered method would not accurately reflect Fischer's freight

expenses because Fischer would in essence be credited for a reimbursement that never actually

occurred. *See Fischer*, 36 CIT at __, 885 F. Supp. 2d at 1374.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Agency Record is

denied and the *Final Results* are sustained. Judgment will enter accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: May 27, 2014
New York, New York